## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PHOSPHATE CHEMICALS EXPORT )
ASSOCIATION, INC., a Delaware )
corporation, )
                         )
            Plaintiff, )
                         )
     vs. )
                         )
LAGINHA AGRO INDUSTRIAL S/A, a )
Brazilian *sociedade anonima* (*i.e.*, )
corporation), and JL COMERCIAL )
AGROQUIMICA LTDA., a Brazilian *limitada* )
(*i.e.*, limited liability company), )
                         )
        Defendants. )

FILE COPY: MAY 23, 2008
08CV3031   EDA
JUDGE   LEFKOW
Case No. MAGISTRATE JUDGE MASON

Hon.

**JURY DEMANDED**

## COMPLAINT

       Plaintiff Phosphate Chemicals Export Association, Inc. ("PhosChem"), by its attorneys, Foley & Lardner LLP, for its Complaint against Defendants Laginha Agro Industrial S/A ("Laginha") and JL Comercial Agroquimica Ltda. ("JL Comercial") (collectively, "Defendants"), states the following:

## INTRODUCTION

       1.     Pursuant to the terms and conditions of a written agreement, PhosChem sold and delivered to JL Comercial $525,835.92 of Granular Monoamonium Phosphate ("GMAP"), a type of fertilizer. Laginha – JL Comercial's parent and principal shareholder – guaranteed payment of the sale pursuant to a written guarantee between Laginha and PhosChem. To date, JL Comercial has not paid PhosChem for the GMAP, nor has Laginha honored its guarantee. Accordingly, PhosChem brings this suit for breach of contract against JL Comercial and to enforce its guarantee agreement against Laginha.

## PARTIES

2.      Plaintiff PhosChem is a Delaware corporation with its principal place of business located at One Overlook Point, Suite 110, Lincolnshire, Illinois, 60069.

3.      Defendant Laginha is a Brazilian corporation with its principal place of business located at Rodovia AL 101, Norte – KM 06, Nr. 3.600 – Maceio-AL – CEP 57033-070.  Laginha is the principal shareholder of and parent company to JL Comercial.

4.      Defendant JL Comercial is a Brazilian limited liability company with its principal place of business located at Avenida Gustavo Paiva, 3.771 Mangabeiras, Maceio-AL-CEP 57032-000.  On information and belief, JL Comerical is 98.3% owned by Laginha, a Brazilian corporation, and 1.7% owned by João José Pereira De Lyra, a citizen of Brazil.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. §1332(a)(2), this Court has diversity jurisdiction over this case as the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between a citizen of a State and citizens or subjects of a foreign state.  Pursuant to 28 U.S.C. § 1332(c)(1), PhosChem is a citizen of the States of Illinois and Delaware.  Defendants are citizens and subjects of Brazil.

6.      This Court has personal jurisdiction over Defendants because a substantial portion of the events in question giving rise to this cause of action occurred in Illinois.  In addition, Laginha submitted to the personal jurisdiction of this Court pursuant to the guarantee agreement between Laginha and PhosChem (the "Guarantee"), a copy of which is attached as Exhibit A.  Likewise, JL Comercial submitted to the personal jurisdiction of this Court in the general terms and conditions ("Terms and Conditions") governing the sale of goods at issue, a copy of which is attached as Exhibit B.

CHIC_2948297.3

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(a) as the relevant transaction giving rise to the claims stated herein occurred within this District.  Laginha expressly consented to venue in this Court for any action on or relating to the Guarantee. (Exhibit A, § 6)

## FACTS

## JL Comerical Purchases GMAP From PhosChem, Then Fails To Pay

8.      On June 13, 2007, JL Comercial entered into a contract with PhosChem pursuant to which JL Comercial was to deliver a certain quantity of GMAP to be shipped from port in Tampa, Florida to Aratu Port in Brazil.

9.      The terms governing JL Comercial's purchase of the GMAP at issue are memorialized in a series of documents, including:

A.      The signed and executed Terms and Conditions dated June 13, 2007; (See Exhibit B)

B.      An executed draft dated June 13, 2007 which was signed and accepted by JL Comercial, a copy of which is attached as Exhibit C;

C.      A commercial invoice for $515,947.85 dated June 13, 2007, a copy of which is attached as Exhibit D;

D.      A confirmation of the GMAP purchase signed by JL Comercial dated August 6, 2007, a copy of which is attached as Exhibit E; and

E.      An invoice dated September 19, 2007 evidencing a demurrage fee relating to JL Comercial's GMAP purchase at issue, a copy of which is attached as Exhibit F.

Collectively, these documents are referred to as the "Agreement."

CHIC_2948297.3

10.    JL Comercial agreed to pay a total of $525,835.92 for the GMAP, which PhosChem shipped on June 13, 2007.  (Exhibits B-F)

11.    The amount currently due to PhosChem under the Agreement (not including costs, expenses, and attorneys' fee) is $525,401.74, as adjusted by an outstanding $434.18 credit PhosChem owes JL Comercial.

12.    The entire $525,401.74 was due on or before December 10, 2007.  (Exhibits C and D).  JL Comercial has not paid any portion of this amount as of the date of this Complaint and, therefore, is in breach of its Agreement with PhosChem.

**Laginha Guarantees JL Comerical's Payment For The GMAP**

13.    Prior to JL Comercial's GMAP purchase at issue, Laginha entered into a Guarantee with PhosChem with an effective date of June 4, 2007.  (Exhibit A)

14.    In the Guarantee, Laginha acknowledged that it was necessary for business purposes to have JL Comercial receive certain extensions of credit from PhosChem, and that Laginha would benefit from such extensions.  (Id., § B)

15.    To that end, Laginha guaranteed payment on all current and future outstanding obligations owed by JL Comercial to PhosChem.  Specifically, Section C of the Guarantee defines obligations broadly as follows:

> The term "Obligations" is used in this Agreement in its most comprehensive sense and includes, without limitation, any and all debts, obligations and liabilities of [JL Comercial] to [PhosChem], heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether [JL Comercial] is liable individually or jointly with others, whether for principal, interest or other debts, obligations or liabilities, and whether any or all such debts, obligations and liabilities are or become barred by any statute of limitations or otherwise unenforceable.

4

16.     Furthermore, Laginha unconditionally guaranteed full and prompt payment to PhosChem in Section 1 of the Guarantee, namely:

> [Laginha] hereby (a) unconditionally guarantees the full and prompt payment and performance of the Obligations when due, whether by acceleration or otherwise, or (if earlier) at the time [JL Comercial] becomes the subject of bankruptcy or other insolvency proceedings, (b) agrees to pay all costs, expenses and reasonable attorneys' fees incurred by [PhosChem] in enforcing this Agreement and the Obligations and realizing on any collateral for either . . . .

17.     Under the Guarantee, PhosChem is entitled to look directly and immediately to Laginha to make payment in full for those obligations owing to it from JL Comercial, and need not make any collection efforts or take any steps whatsoever to attempt to secure payment from JL Comercial.  (Id., § 2)

18.     In addition, Laginha's obligations under the Guarantee are absolute.  Specifically, Section 3 of the agreement provides in relevant part:

> [Laginha's] liability for payment and performance of the Obligations shall be absolute and unconditional; [Laginha] unconditionally and irrevocably waives each and every defense that, under principles of guarantee and suretyship law, would otherwise operate to impair or diminish such liability; and nothing whatsoever except actual full payment and performance to [PhosChem] of the Obligations (and all other debts, obligations and liabilities of [Laginha] under this Agreement) shall operate to discharge [Laginha's] liability hereunder.

19.     After JL Comercial failed to make payment in full on the GMAP shipment as of December 10, 2007, PhosChem attempted to contact both JL Comercial and Laginha many times in an effort to secure payment.  Finally, on April 22, 2007 PhosChem sent a letter demanding full payment from both JL Comercial and Laginha, giving them seven days to respond.  PhosChem was under no obligation to make such demands upon JL Comercial or Laginha.

CHIC_2948297.3

20.     Defendants have failed to respond to Phosphate Chemical's demands and inquiries regarding the outstanding $525,401.74 obligation due on JL Comercial's GMAP order.

21.     Additionally, Laginha breached its obligations under Section 6 of the Guarantee Agreement by failing to take all necessary steps to properly designate and appoint CT Corporation Systems ("CT Corp."), with offices located at 208 South LaSalle Street, Chicago, Illinois 60604, as its registered agent and attorney-in-fact to accept and acknowledge service of process under the Guarantee.

## COUNT I

## Breach Of Continuing Guarantee

22.     PhosChem restates and incorporates Paragraphs 1 through 21 of the Complaint as and for Paragraph 22.

23.     The Guarantee is a valid and enforceable agreement between Laginha and PhosChem, both of whom entered into the Guarantee voluntarily.

24.     PhosChem performed all of its obligations under the Guarantee.

25.     Laginha has not satisfied its obligations under the Guarantee by, without limitation, failing to make payment in full to PhosChem for all outstanding obligations of its subsidiary, JL Comercial, and failing to designate CT Corp. as its registered agent.  As such, Laginha has breached the terms of the Guarantee.

26.     As a result of Laginha's breach, PhosChem has suffered damages in excess of $525,401.74, with interest, costs and fees continuing to accrue daily through the date of judgment.

WHEREFORE, PhosChem prays that this Court enter judgment in its favor and against Laginha on Count I of the Complaint,

6

     a.     Awarding PhosChem compensatory damages in the amount of no less than $525,401.74 plus all accrued interest, costs and fees;

     b.     Awarding PhosChem all costs, fees and expenses (including reasonable attorneys' fees) incurred in enforcing the Guarantee, as provided by the Guarantee; and

     c.     Granting such other and further relief as the Court deems just and proper.

## COUNT II

### Breach Of Contract

27.     PhosChem restates and incorporates Paragraphs 1 through 26 of the Complaint as and for Paragraph 27.

28.     The Agreement is valid and enforceable as between JL Comercial and PhosChem, both of whom entered into the agreements voluntarily.

29.     PhosChem performed all of its obligations under the Agreement including, without limitation, timely shipping and providing the GMAP to JL Comercial in Brazil.

30.     JL Comercial has failed to satisfy its obligations under the Agreement by, without limitation, failing to make payment in full on or before the due date of December 10, 2007. As such, JL Comercial has breached the terms of the Agreement.

31.     As a result of JL Comercial's breaches, PhosChem has suffered damages in excess of $525,401.74, with interest, costs and fees continuing to accrue daily through the date of judgment.

     WHEREFORE, PhosChem prays that this Court enter judgment in its favor and against JL Comercial on Count II of the Complaint,

     a.     Awarding PhosChem compensatory damages in the amount of no less than $525,401.74 plus all accrued interest, costs and fees;

CHIC_2948297.3

b.      Awarding PhosChem all costs, fees and expenses (including reasonable

attorneys' fees) incurred in enforcing JL Comercial's obligations, as provided for by the

Agreement; and

c.      Granting such other and further relief as the Court deems just and proper.


Dated:  May 23, 2008                          PHOSPHATE CHEMICALS EXPORT
                                              ASSOCIATION, INC.


                                              By:  /s/ Martin J. Bishop
                                                      One of Its Attorneys

                                              Martin J. Bishop (IL Bar No. 06269425)
                                              Daniel M. Cordis (IL Bar No. 6285963)
                                              Foley & Lardner LLP
                                              321 North Clark Street, Suite 2800
                                              Chicago, IL 60610-4764
                                              312.832.4500
                                              312.832.4700

CHIC_2948297.3

08CV3031   EDA
JUDGE  LEFKOW
MAGISTRATE JUDGE MASON

# Exhibit A

LAGINHA AGRO INDUSTRIAL S/A  GRUPO **JOÃO LYRA**

## GUARANTEE AGREEMENT

**THIS GUARANTEE AGREEMENT** (this "Agreement") is made and effective as of June, 4th 2007 by LAGINHA AGRO INDUSTRIAL S/A – Rodovia AL 101, Norte – KM 06 – Nr. 3.600 – Maceio-AL – CEP 57033-070 – CNPJ 12.274.379/0001-07 ("Guarantor") in favor and for the benefit of Phosphate Chemicals Export Association, Inc. ("Creditor").

### RECITALS

A.     Creditor has required, as a condition to making certain credit available to **JL Comercial Agroquímica Ltda** – CNPJ 12.190.013/0001-50 – Av. Gustavo Paiva, 3.771 – Mangabeiras, Maceió-AL ("Debtor"), that Guarantor guarantee the Obligations (as defined below) on the terms set forth in this Agreement.

B.     It is necessary for the business purposes of Guarantor that Debtor obtains the credit made available by Creditor. Guarantor is the principal shareholder of Debtor. As a result, Guarantor will obtain direct or indirect benefits from the credit made available to Debtor by Creditor.

C.     The term "Obligations" is used in this Agreement in its most comprehensive sense and includes, without limitation, any and all debts, obligations and liabilities of Debtor to Creditor, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, secured or unsecured, whether Debtor is liable individually or jointly with others, whether for principal, interest or other debts, obligations or liabilities, and whether any or all such debts, obligations and liabilities are or become barred by any statute of limitations or otherwise unenforceable.

### AGREEMENT

In consideration of the foregoing, any credit or financial accommodation now or hereafter granted by Creditor to Debtor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.     Guarantor hereby (a) unconditionally guarantees the full and prompt payment and performance of the Obligations when due, whether by acceleration or otherwise, or (if earlier) at the time Debtor becomes the subject of bankruptcy or other insolvency proceedings, (b) agrees to pay all costs, expenses and reasonable attorneys' fees incurred by Creditor in enforcing this Agreement and the Obligations and realizing on any collateral for either and (c) agrees to pay to Creditor the amount of any payments made to Creditor or another in connection with any of the Obligations that are recovered from Creditor by a trustee, receiver, creditor or other party pursuant to applicable law.

2.     This is a guarantee of payment, and not of collection. Creditor shall not be obligated to: (a) take any steps whatsoever to collect from, or to file any claim of any kind against, Debtor, any guarantor or any other person or entity liable for payment or performance of any of the Obligations; or (b) take any steps whatsoever to protect, accept, obtain, enforce, take possession of, perfect its interest in, foreclose or realize on collateral or security, if any, for the payment or performance of any of the Obligations or any guarantee of any of the Obligations; or (c) in any other respect exercise any diligence whatsoever in collecting or attempting to collect any of the Obligations by any means.

3.     Guarantor's liability for payment and performance of the Obligations shall be absolute and unconditional; Guarantor unconditionally and irrevocably waives each and every defense that, under principles of guarantee or suretyship law, would otherwise operate to impair or diminish such liability; and nothing whatsoever

MATRIZ: Fazenda Laginha, s/n-União dos Palmares/AL-CEP 57.800-000-Fones:(082)218-8300 (PABX)-218-8107 (Suprimento) 218-8351 (Fax)
FILIAL: Fazenda Guaxuma, s/n - Corunpe/AL - CEP 57.230-000 - Fones (082) 218-8500 (PABX) - 218-8109 (Suprimento) - 218-8551 (Fax)
FILIAL: Fazenda Uruba, s/n - Atalaia/AL - CEP 57690-000 - Fones: (082) 218-8100 (PABX) - 218-8108 (Suprimento) - 218-8151 (Fax)
FILIAL: Rod. BR 365 KM 734 - Canápolis - MG-CEP 38300-000 - Fone(034)-268-0200(PABX)
ESC. DE MACEIÓ: Rod.AL 101 Norte Km 8 n.° 3800 - Jacarecica - Maceió/AL-CEP 57033-070-Fones:(082)355-5322 (PABX)-355-5033 (Fax)



LAGINHA AGRO INDUSTRIAL S/A  GRUPO *JOÃO LYRA*

except actual full payment and performance to Creditor of the Obligations (and all other debts, obligations and liabilities of Guarantor under this Agreement) shall operate to discharge Guarantor's liability hereunder. Without limiting the generality of the foregoing, Creditor shall have the exclusive right, which may be exercised from time to time without diminishing or impairing the liability of Guarantor in any respect, and without notice of any kind to Guarantor, to:  (a) extend any additional credit to Debtor; (b) accept any collateral, security or guarantee for any Obligations or any other credit; (c) determine how, when and what application of payments, credits and collections, if any, shall be made on the Obligations and any other credit and accept partial payments; (d) determine what, if anything, shall at any time be done with respect to any collateral or security; subordinate, sell, transfer, surrender, release or otherwise dispose of all or any of such collateral or security; and purchase or otherwise acquire any such collateral or security at foreclosure or otherwise; and (e) with or without consideration, grant, permit or enter into any waiver, amendment, extension, modification, refinancing, indulgence, compromise, settlement, subordination, discharge or release of:  (i) any of the Obligations and any agreement relating to any of the Obligations, (ii) any obligations of any guarantor or other person or entity liable for payment or performance of any of the Obligations, and any agreement relating to such obligations and (iii) any collateral or security or agreement relating to collateral or security for any of the foregoing.

4.      Guarantor hereby unconditionally waives (a) presentment, notice of dishonor, protest, demand for payment and all notices of any kind, including, without limitation, notice of acceptance hereof, notice of the creation of any of the Obligations, notice of nonpayment, nonperformance or other default on any of the Obligations and notice of any action taken to collect upon or enforce any of the Obligations; (b) any subrogation to the rights of Creditor against Debtor and any other claim against Debtor that arises as a result of payments made by Guarantor pursuant to this Agreement; (c) any claim for contribution against any co-guarantor, until the Obligations have been paid or performed in full and such payments are not subject to any right of recovery; (d) any setoffs or counterclaims against Creditor that would otherwise impair Creditor's rights against Guarantor under this Agreement; and (e) any benefits of order or precedence for the seizure and execution of the assets of Debtor *vis a vis* those of Guarantor. Guarantor has made an independent investigation and evaluation of the financial condition of Debtor and the value of any collateral, and has not relied (and will not rely) on any information or evaluation provided by Creditor regarding such condition or value.

5.      All payments to be made by Guarantor under this Agreement shall be made in U.S. Dollars and in immediately available funds at the principal office of Creditor in Lincolnshire, Illinois, free and clear of and without deduction for or on account of any present or future income, stamp or other taxes, levies, costs, withholdings or charges whatsoever imposed, assessed, levied or exacted by the laws of Brazil or any political subdivision thereof or taxing authority therein, on or in respect to the Obligations, any registration or other formalization thereof, and any payments of principal, interest, fees or other amounts under this Agreement or the Obligations (collectively, "Non-U.S. Taxes"); and Guarantor shall pay when due, for its own account, all Non-U.S. Taxes, shall promptly furnish Creditor from time to time such tax receipts, information and documents as Creditor may reasonably request to establish to its satisfaction that all Non-U.S. Taxes have been paid, and shall indemnify Creditor and reimburse it upon demand for all Non-U.S. Taxes paid by Creditor and for all costs, losses or liabilities suffered or incurred by Creditor arising out of the failure by Guarantor to pay when due all Non-U.S. Taxes.  Guarantor acknowledges that the specifications of U.S. Dollars and payment in Lincolnshire, Illinois is of the essence, and U.S. Dollars shall be the currency of account in all events.  The payment obligations of Guarantor shall not be discharged by an amount paid in another currency or in another place, whether pursuant to a judgment or otherwise, to the extent the amount so paid on prompt conversion to U.S. Dollars and transferred to Lincolnshire, Illinois under normal banking procedures does not yield the amount of U.S. Dollars in Lincolnshire, Illinois due under this Agreement.  In the event any payment by Guarantor, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of U.S. Dollars in Lincolnshire, Illinois, Creditor shall have a separate cause of action against Guarantor for the additional amount necessary to yield the amount due and owing to Creditor.




**MATRIZ:** Fazenda Laginha, s/n-União dos Palmares/AL-CEP 57.800-000-Fones:(082)218-8300 (PABX)-218-8107 (Suprimento) 218-8351 (Fax)
**FILIAL:** Fazenda Guaxuma, s/n - Coruripe/AL - CEP 57.230-000 - Fones (082) 218-8500 (PABX) - 218-8109 (Suprimento) - 218-8551 (Fax)
**FILIAL:** Fazenda Uruba, s/n - Atalaia/AL - CEP 57690-000 - Fones (082) 218-8100 (PABX) - 218-8108 (Suprimento) - 218-8151 (Fax)
**FILIAL:** Rod. BR 365 KM 734 - Canápolis - MG-CEP 38300-000 - Fone(034)-268-0200(PABX)
**ESC. DE MACEIÓ:** Rod AL 101 Norte Km 6 n.º 3600 - Jacarecica - Maceió/AL-CEP 57033-070-Fones (082)355-5322 (PABX)-355-5033 (Fax)

LAGINHA AGRO INDUSTRIAL S/A  GRUPO **JOÃO LYRA**

6.      This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, U.S.A., without regard to choice of law principles. Any suit, action or proceeding with respect to this Agreement and/or the Obligations, or any judgment entered by any court in respect thereof, may be brought in the courts of the State of Illinois, U.S.A. or of The United States of America sitting in the State of Illinois, U.S.A. Guarantor hereby irrevocably submits, for itself and in respect of its property generally and unconditionally, at the election of Creditor, to the jurisdiction of the courts of the State of Illinois, U.S.A. or of The United States of America sitting in the State of Illinois, U.S.A. over any suit, action or proceeding arising out of or relating to this Agreement and/or the Obligations. Guarantor irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Guarantor agrees that final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon Guarantor and may be enforced in the courts of any jurisdiction of which Guarantor is or may be subject by a suit upon such judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of Guarantor's indebtedness, provided that service of process is effected upon Guarantor in one of the manners specified below or as otherwise permitted by law.

Guarantor hereby irrevocably designates and appoints CT Corporation Systems (the "process agent") presently having an office at CT Corporation System, 208 South LaSalle Street, Chicago, Illinois 60604 as its lawful and authorized agent and attorney-in-fact in its name, place and stead to accept and acknowledge service of any and all writs, processes and summonses on its behalf that may be served in any suit, action or proceeding of the nature referred to in this Agreement in any courts of the State of Illinois, U.S.A. or of The United States of America sitting in the State of Illinois, U.S.A., and agrees that failure of any such process agent to give any notice of such service to Guarantor shall not impair or affect the validity of such service or any judgment rendered in any action or proceeding or judgment based thereon. If such agent shall cease so to act for any reason whatsoever, then Guarantor covenants and agrees that it shall irrevocably designate and appoint without delay another such agent satisfactory to Creditor and shall promptly deliver to Creditor evidence in writing of such other agent's acceptance of such appointment. Guarantor hereby irrevocably consents to process being served in any suit, action or proceeding of the nature referred to in this Agreement by serving a copy thereof upon the process agent as Guarantor's agent for service of process, provided that, to the extent lawful and possible, written notice of such service of the process upon the process agent shall be mailed by registered or certified mail, postage prepaid, return receipt requested, to Guarantor at its address specified below, or to any other address of which Guarantor shall have given notice to Creditor, or, if such service is impossible or impracticable in the sole judgment of the party serving such process, by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the address of Guarantor set forth below or to any other address of which Guarantor shall have given written notice to Creditor. Guarantor irrevocably waives, to the fullest extent permitted by law, all claims of error by reason of any such service and agrees that such service (a) shall be deemed in every respect effective service of process upon Guarantor or in any such suit, action or proceeding, and (b) shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon and personal delivery to Guarantor.
Nothing in this Agreement or otherwise shall affect the rights of Creditor to serve process in any manner permitted by law or limit the right of Creditor to bring proceedings against Guarantor in the competent courts of any other jurisdiction or jurisdictions.

7.      If any term, covenant or condition of this Agreement or the Obligations or the application thereof to any person, entity or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Agreement or the Obligations, or the application of such term, covenant or condition to persons, entities or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each such term, covenant or condition of this Agreement and the Obligations shall be valid and be enforced to the fullest extent permitted by law.

**MATRIZ:** Fazenda Laginha, s/n-União dos Palmares/AL-CEP 57.800-000-Fones:(082)218-8300 (PABX)-218-8107 (Suprimento) 218-8351 (Fax)
**FILIAL:** Fazenda Guaxuma, s/n - Coruripe/AL - CEP 57.230-000 - Fones: (082) 218-8500 (PABX) - 218-8109 (Suprimento) - 218-8551 (Fax)
**FILIAL:** Fazenda Uruba, s/n - Atalaia/AL - CEP 57690-000 - Fones. (082) 218-8100 (PABX) - 218-8108 (Suprimento) - 218-8151 (Fax)
**FILIAL:** Rod. BR 365 KM 734 - Canápolis - MG-CEP 38300-000 - Fone(034)-268-0200(PABX)
**ESC. DE MACEIÓ:** Rod.AL 101 Norte Km 6 n.º 3600 - Jacarecica - Maceió/AL-CEP 57033-070-Fones:(082)355-5322 (PABX)-355-5033 (Fax)



LAGINHA AGRO INDUSTRIAL S/A                        

8.     Guarantor shall furnish to Creditor promptly such information regarding the business, assets and financial condition of Guarantor and its subsidiaries as Creditor may reasonably request from time to time. If Guarantor grants to any creditor any mortgage, pledge, lien, security interest or other charge or encumbrance on any of its property or assets, then Guarantor shall give Creditor prompt written notice thereof and make or cause to be made effective provisions whereby the Obligations will be secured by such mortgage, pledge, lien, security interest, charge or encumbrance equally and ratably with all other obligations and liabilities thereby secured. Guarantor shall call specific attention to this provision in all financial statements provided by Guarantor to its creditors.

9.     This Agreement shall inure to the benefit of Creditor and its successors and assigns, including every holder or owner of any of the Obligations, and shall be binding upon Guarantor and Guarantor's successors and assigns. Guarantor may not assign its rights or obligations under this Agreement, in whole or in part, voluntary or by operation of law, without the prior written consent of Creditor, and any attempted assignment without such consent shall be null and void. This is a continuing guarantee, and shall continue in effect until Creditor shall have received written notice of termination from Guarantor, provided that this guarantee shall continue in effect thereafter with respect to all Obligations that arise or are committed for prior to Creditor's receipt of such notice of termination (including, without limitation, all subsequent extensions and renewals thereof, including extensions and renewals at increased rates, and all subsequently accruing interest and other charges thereon) until all such Obligations and all obligations of Guarantor under this Agreement shall be paid or performed in full and such payments are not subject to any right of recovery.

10.     This Agreement constitutes the entire agreement between Creditor and Guarantor with respect to the subject matter hereof, superseding all previous communications and negotiations, and no representation, understanding, promise or condition concerning the subject matter hereof shall be binding upon Creditor unless expressed in this Agreement.

GUARANTOR:

LAGINHA AGRO INDUSTRIAL S/A

Antonio Melo Rezende    Luiz Brandão Coelho do Paz Junior
Procurador         Procurador
CPF 111.181.054-00    CPF 127.036.487-15

Address:
Rodovia AL 101 Norte – Km 06 – Nr. 3.600 – Maceio/AL – Cep 57033-070

MATRIZ: Fazenda Laginha, s/n-União dos Palmares/AL-CEP 57.800-000-Fones:(082)218-8300 (PABX)-218-8107 (Suprimento) 218-8351 (Fax)
FILIAL: Fazenda Guaxuma, s/n - Coruripe/AL - CEP 57.230-000 - Fones: (082) 218-8500 (PABX) - 218-8109 (Suprimento) - 218-8551 (Fax)
FILIAL: Fazenda Uruba, s/n - Atalaia/AL - CEP 57690-000 - Fones: (082) 218-8100 (PABX) - 218-8108 (Suprimento) - 218-8151 (Fax)
FILIAL: Rod. BR 365 KM 734 - Canápolis - MG-CEP 38300-000 - Fone(034)-268-0200(PABX)
ESC. DE MACEIÓ: Rod.AL 101 Norte Km 6 n.º 3600 - Jacarecica - Maceió/AL-CEP 57033-070-Fones:(082)355-5322 (PABX)-355-5033 (Fax)

# Exhibit B

ORIGINAL

| TRANSPORT OF HARMLESS BULK FERTILIZERS TO BRASIL |
|---|

| CONTRACT NBR.: -029/07 | BOOKING NOTE NBR.: 141/07 |
|---|---|

| NAME OF VESSEL: PINTAIL |
|---|

| CHARTERERS/SHIPPERS: MOSAIC CROP NUTRITION, LLC |
|---|

| RECEIVER;  JL COMERCIAL AGROQUIMICA LTDA |
|---|

| CARGO DESCRIPTION | |
|---|---|
| TYPE: GMAP - Monoamonium Phosphate 11-52 | QUANTITY:  MT 2.090,000 IN BULK |

| LOADING | |
|---|---|
| PORT: TAMPA, FL - U.S.A. | ETA: JUNE 2007 |

| DISCHARGING | |
|---|---|
| PORT:. SALVADOR, BRASIL | RATE:  3.000 MT/DAY SHINC |

| FREIGHT RATE: USD 46.00 PER METRIC TON. |
|---|

| DEMURRAGE/DESPATCH: USD 25,000.00/USD 12,500.00 |
|---|

All other terms and conditions covering the transport of the above mentioned cargo to be as per clauses 01 to 18 as shown in the booking note Nr. 029/07 of June 13, 2007.

São Paulo June 13th, 2007

JL. COMERCIAL AGROQ. LTDA
Roberto Peixoto Menezes
Diretor
_____
Receivers

Mosaic Crop Nutrition, LLC

_____
For and on behalf of Charterers/Shippers

ORIGINAL

## TRANSPORT OF HARMLESS BULK FERTILIZERS TO BRASIL

RIDER TO BOOKING NOTE NBR. C-029/07, OF 13/06/07, BETWEEN
MOSAIC CROP NUTRITION, LLC
JL COMERCIAL AGROQUIMICA LTDA

AS CHARTERERS/SHIPPERS
AS RECEIVERS

01.     Shippers to have the option of commingling with other cargoes of same grade within same hold (s).

02.     Rotation of discharging ports as well as berths at each discharge port always to be in Owner's option.

03.     The cargo to be discharged by receivers' stevedores, free of risk and expense to the vessel, at an average rate as set forth in the respective booking note (s), always per weather working day of 24 (twenty four) consecutive hours, Sundays and Holidays included.

04.     At each discharging port Notice of Readiness to be tendered upon vessel's arrival, whether in port or berth or free pratique or not. For Salvador port vessel can tender during office hours Monday to Friday 09:00-17:00 & Saturday 09:00 – 12:00 and time to start 08:00 next business days.

05.     Provided a valid and substantiated Force Majeour is not in existence, lack of labor, or those periods, as per custom of each discharging port, commonly referred to in the Statement of Facts as "Restraint of Authorities" and/or "Meal Hours" not to be excepted time and therefore Laytime is to be computed accordingly.

06.     Time lost in waiting for berth and shortage or lack of wagons and/or trucks at any time to count as laytime.

07.     Time spent in shifting between berths at discharging port as shown in the respective booking note (s) to be computed as laytime and expenses incurred for this purpose to be for Receiver's account. Shifting from anchorage to berth not to count as laytime.

08.     Demurrage at discharging ports, if any, to be paid by receivers at the rate as stated in the respective Booking Note (s) per running day of 24 hours or pro rata for any part of a day, for all time in excess of allowed Laytime, and Despatch, if any, to be paid by Owners at half Demurrage rate, for all working time saved at discharging ports.
Demurrage and Despatch to be computed and settled separately for each discharging port and/or berth. Should other cargoes not governed by this Booking Note be discharged at the same berth as the cargo booked herein, the laytime calculation are then to be prepared on pro-rata basis. However, should one party be conclusively proven to be solely at fault for delays caused in discharging, then such party to be held individually/solely responsible for any time thereby lost.
Laytime non-reversible.

09.     Receivers to employ first class stevedores. Stevedores' damages to the vessel, if any, to be settled between Owners and stevedores however Receivers remaining the ultimate party responsible for the prompt settlement of same.

10.     Owners to pay customary harbor dues and port charges on vessel only and all her normal expenses at discharging port (s).

11.     Any dues and/or taxes and/or fines cargo and/or overages/shortages and all normal cargo expenses, namely port utilization Tax, Merchant Marine Renewal Tax, Inframar Tax, to be for Receiver's account.

12.     Overtime, if any, to be for the account of the party ordering it. However, if overtime is ordered by port Authorities, same to be for Receiver's account. Vessel's officer's and crew's overtime to be Owners account.

13.     Opening and closing of hatches at discharging ports, to be performed by crew at Owners' expenses provided local labor regulations so permit, otherwise to be for Receiver's account. Time used for opening/closing of hatches to count as laytime.

14.     Upon completion of discharge, vessel's holds to be swept-clean at Receiver's time and expense pro-rata.

15.     Should the vessel be ordered by receivers and/or Port Authorities to load or discharge at more than one berth or leave the berth at each load and/or discharge port (s), shifting expenses to be for Receiver's account, and time used to count as laytime or as time on demurrage. Should the vessel be ordered by Owners to load or discharge at more than one berth at each load and/or discharge port (s), shifting expenses to be for Owners' account, and time used not to count as laytime.

16.     The following clauses, as mentioned herein, are fully incorporated within this Booking Note:
General Strike Clause, U.S.A. Paramount Clause, P& I bunkering Clause, New Both-to-Blame Collision Clause and New Jason Clause:

**ORIGINAL**

| TRANSPORT OF HARMLESS BULK FERTILIZERS TO BRASIL |
| --- |

**General Strike Clause:** If there is a Strike or Lock-out affecting the discharge of the cargo on or after vessel's arrival at port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end and against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk or being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Receivers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased proportion.

**U.S.A. Paramount Clause:** This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any responsibilities or liabilities under said act.
If any term of this Bill of Lading be repugnant to said Act to any extend, such term shall be void to that extent but no further.

**P& I Bunkering Clause:** The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this Charter Party and there take oil bunkers in any quantity in the discretion of the Owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried whether such amount is or not required for the chartered voyage. However, if it is necessary for the vessel to make a deviation for oil bunkers under its liberty to do so granted by this clause, vessel Owners are to keep Receivers fully informed in advance of, or concurrently with such deviation as to the estimated loss of time which will be occasioned thereby and the intended bunkering port, and this clause shall not be construed to relieve the vessel and/or Owners from any other obligation whatsoever under the terms and conditions of this Charter.

**New Both-to-Blame Collision Clause:** If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:
"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, Marine, Pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners cargo, paid or payable by the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contract", and the Receivers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**New Jason Clause:** "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifice, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the Carrier, salvage shall be paid for as if the said salving ship belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery", and the Receivers shall procure that all Bill of Lading issued under this Charter Party shall contain the same clause.

17.    It is understood that once vessel is in demurrage she will always be in demurrage.

18.    The time used for trimming the cargo inside of holds and/or shifting of cranes between holds, shifting vessel alongside quay, placing/removing/maneuvering bulldozer in holds, are to be considered part of discharging operation and time used to count even on excepted periods or before commencement of laytime.

São Paulo June 13th, 2007.

**Mosaic Crop Nutrition LLC**

JL. COMERCIAL AGROQ. LTDA
Roberto Peixoto Menezes
Diretor

Receiver

For and on behalf of Charterers/Shippers

# GENERAL TERMS AND CONDITIONS

**EXCEPTIONS**

Seller shall not be liable for damages, delay or non or partial delivery due to any of the following causes (or any circumstances beyond the reasonable control of Seller or its suppliers not herein enumerated, similar or dissimilar) which shall prevent Seller from making delivery in the usual course of business, whether occurring at Seller's or its suppliers' plant(s), in course of transportation, at port of delivery or elsewhere: war, revolution, or civil commotion; strikes, lockouts or labor troubles; embargoes, breakdown or stoppage of railways, shortage of cars, interruption of Seller's or its suppliers' fuel or power supply; delay or damage to goods in transit; epidemics, fire, tempests, acts of God; accidents or breakdowns of machinery or equipment; direct or indirect hindrances of any kind in manufacture, transportation or loading phosphatic material occurring without the negligence of the Seller or its suppliers, or due to the amount of the phosphatic material in question available to Seller, for whatsoever reasonable cause, being less than its total needs. In such event, upon due notice to Buyer, Seller may without liability either suspend deliveries or allocate its available supply of such material among its existing and prospective customers in such manner as Seller deems reasonable until such impediment shall have been cured, provided always that if such impediment shall not have been cured within 60 days after the original shipping period for the quantity concerned, such non-shipped quantity may then be cancelled by either Seller or Buyer, without liability, in which event notice of such cancellation must be dispatched by fax and confirmed by registered mail within 15 days after the termination of the period of 60 days' extension above referred to, and in the event the quantity deliverable under this contract shall be reduced accordingly.

**TAXES**

Any tax or other governmental charge now or hereafter payable by Seller or its suppliers on or measured by the manufacture, production, processing, transportation, trafficking in, or sale of material covered by this Agreement (excluding taxes on income) shall be paid by Buyer to Seller in addition to the price specified herein.

**WARRANTY**

Seller warrants that the materials sold hereunder conform to the description under "Product and Specifications" above.  THIS EXPRESS WARRANTY IS IN LIEU OF AND EXCLUDES, AND SELLER HEREBY EXPRESSLY DISCLAIMS, ALL OTHER WARRANTIES EXPRESSED OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. BUYER ASSUMES ALL RISK WHATSOEVER AS TO THE RESULT OF THE USE OF THE MATERIAL PURCHASED WHETHER USED ALONE OR IN COMBINATION WITH OTHER SUBSTANCES.

**LIABILITY AND INDEMNIFICATION**

Seller shall not be liable for any special, indirect, incidental or consequential damages or expenses of any kind arising out of or in connection with this contract or any breach of this contract (including breach of express warranty), nor for any direct, special, indirect, consequential damages or expenses resulting from Buyer's or its customer(s)' sale, handling or use of the goods sold hereunder. Buyer agrees to indemnify and hold Seller and its officers and agents harmless from and against all loss, liability, costs, damage or expense whatsoever (including reasonable attorney's fees) incident to any actual or threatened claim, action or proceeding brought by a customer of Buyer or other third party against Seller arising out of the purchase, use or sale by Buyer or its customer(s) of the goods covered by this contract.

**LICENSES AND SUPPORT**

It is understood that delivery under this contract is subject to both Buyer and Seller being able to procure, respectively, import licenses from country of destination and export licenses from the United States, if any are required. Buyer and Seller, respectively, each agree to use its best efforts to obtain all required import licenses from country of destination and export licenses from the United States. Buyer shall be responsible for and shall bear all costs involved in obtaining all government permissions and authorizations necessary for the importation of the goods sold hereunder and for the prompt remittance of the purchase price to Seller. If Buyer is unable to obtain any such permission or authorization, it shall notify Seller immediately, and in any event prior to the date materials are first scheduled for loading. Buyer certifies that, to the best of its knowledge, the transaction covered by this contract does not involve financing pursuant to a United States foreign aid or similar support program.

**GOVERNMENTAL RESTRICTIONS**

The manufacture, shipment and delivery of the materials sold hereunder are subject to, and Seller shall be excused from performance as and to the extent that performance is prohibited or restricted by, any law, prohibition, restriction, priority, allocation, regulation, order or rule of the United States or any court or governmental agency of the United States or any political subdivision thereof, or of any other government, court, governmental agency or body having jurisdiction in the premises.

**CONFIDENTIALITY**

Buyer and its directors, managers, employees, agents, and representatives will maintain in strictest confidence and will not disclose or make available, directly or indirectly, to any third party the terms and conditions (including quantity, shipment, and pricing terms) of any sale by Seller to Buyer, except with the prior written approval of Seller. Buyer covenants to Seller that it will not disclose or make available such terms and conditions to any of its directors, managers, employees, agents, or representatives, unless such person is obligated to not disclose or make available, directly or indirectly, to any third party such terms and conditions. Buyer acknowledges that such terms and conditions are not readily ascertainable by proper means by third parties and are not generally known by third parties.

**GOVERNING LAW**

This contract is to be construed, and the respective rights of the parties hereto are to be determined, according to the law of the State of Illinois (U.S.A.), without regard to principles of conflict of laws. Buyer hereby submits to the non-exclusive jurisdiction of the state and federal courts in Chicago, Illinois (U.S.A.).

**MISCELLANEOUS**

Failure of Seller to exercise any right under this contract shall not be deemed a waiver thereof. Seller reserves the right to suspend deliveries where payment by Buyer for any related or unrelated order has not been paid when due and remains unpaid.

This contract is not assignable by either party, except to the successor to, or transferee of, all or substantially all of the party's assets.

This document constitutes the complete and exclusive statement of the terms of the agreement between the parties hereto with reference to the subject matter hereof. No customs or usages in the trade, no statement or agreement, oral or written, made prior to or at the signing hereof and no prior course of dealing or practice by either party shall vary or modify the written terms hereof. Neither party shall claim any modification from any provision hereof unless such modification is in writing, signed by the other party and specifically states it is an amendment to the contract. Any term or condition proposed by Buyer, in its purchase order or otherwise, inconsistent with or in addition to the terms and conditions contained herein shall be deemed objected to by Seller and shall not be binding on Seller unless expressly accepted in writing. Seller reserves the right to correct stenographical or clerical errors.

All notices, requests, demands and other communications to any party hereunder must be in writing and shall be deemed to have been duly given if sent by fax to the number set forth above. Notice of breach of this Agreement or of cancellation of shipment (as provided in the "Exceptions" paragraph above) shall be confirmed by first-class registered mail, postage and fees prepaid, to the address of such party set forth above. Addresses and fax numbers may be changed by notice in writing signed by the party changing its address and fax number.

Buyer agrees any claim, action or proceeding of any kind by Buyer based on or relating to this contract or the products purchased hereunder shall be barred unless asserted by Buyer in writing within 90 days from the date of discharge. If a dispute arising hereunder results in litigation, the prevailing party shall be entitled to indemnification by the other party for the prevailing party's court costs and reasonable attorney's fees. Seller shall, if justified, pay Buyer's claim within 30 days of Seller's receipt of the claim letter. Unless the Seller receives a claim letter from Buyer within 90 days of the completion of the discharge of the vessel, the claim shall be time-barred.

The headings of this contract are for ease of reference only and shall not limit or otherwise affect the meaning hereof.



# Exhibit C



# ORIGINAL

## DRAFT

USD    515,947.85                    DATE:          June 13, 2007

At 180 days from B/L date, this *Trade Draft* to mature on          December 10, 2007

*Pay to the Order of*              Phosphate Chemicals Export Association, Inc.

Five Hundred Fifteen Thousand Nine Hundred Forty Seven and 85/100 United States Dollars Only

In immediately available funds, without deduction for and free of any present or future taxes, imposts, collection charges, whatsoever, including levies, duties or withholding taxes, of any Nature.

*For Value received and charge the same to account of:*

To:
JL Comercial Agroquimica Ltda.           Phosphate Chemicals Export Association, Inc.
CIA Norte, Via Candeias – KM 1,5         One Overlook Point, Suite 110
43800-000 – Candeias – BA.               Lincolnshire, Illinois 60069 USA
CNPJ: 12.190.013/0002-30

_____
Authorized Signature

Order No.           GMAP 076063
Merchandise:        1,045.000 MT Granular Monoamonium Phosphate – Fosfato Monoamonico
                    Granulado
Maturity:           December 10, 2007
Vessel:             M/V Pintail
Invoice No.:        12250

## ACCEPTED:

JL Comercial Agroquimica Ltda.
CIA Norte, Via Candeias – KM 1,5
43800-000 – Candeias – BA.
CNPJ: 12.190.013/0002-30

I hereby affirm that I am the _____ (Title of Officer)
of          JL Comercial Agroquimica Ltda.
and am authorized to sign on behalf of     JL Comercial Agroquimica Ltda.
I further verify that my powers are not limited and I am authoried to sign and accept this Draft
For the full value.

J L COMERCIAL AGROQUÍMICA LTDA

Name: _____
Title:

Antonio Melo Rezende
Procurador
CPF 111.181.054-00

Luiz Brandão Coelho da Paz Júnior
Procurador
CPF 127.036.487-15

I hereby affirm that I am the _____ (Title of Officer)
of          JL Comercial Agroquimica Ltda.
and am authorized to sign on behalf of     JL Comercial Agroquimica Ltda.
I further verify that my powers are not limited and I am authoried to sign and accept this Draft
For the full value.

J L COMERCIAL AGROQUÍMICA LTDA

Name: _____
Title:

Antonio Melo Rezende
Procurador
CPF 111.181.054-00

Luiz Brandão Coelho da Paz Júnior
Procurador
CPF 127.036.487-15

# Exhibit D



# Exhibit E

*12-10*

PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC.
One Overlook Point, Suite 110
Lincolnshire, Illinois 60069 U.S.A.
Tel: 763-577-2700 • Fax: 847-478-0994

**PhosChem**  COPY

**COMMERCIAL INVOICE**

| PROFORMA INVOICE NUMBER AND DATE | INVOICE DATE | | PHOSCHEM ORDER NO. | PHOSCHEM INVOICE NO. |
|---|---|---|---|---|
| 0293/07  -  08/06/2007 | June 13, 2007 | | GMAP 076063 | 12250 |

| SOLD TO/IMPORTER | SHIP TO/CONSIGNEE |
|---|---|
| JL COMERCIAL AGROQUIMICA LTDA<br>CIA NORTE, VIA CANDEIAS - KM 1,5<br>CANDEIAS - BA<br>43.800-000<br>CNPJ 12.190.013/0002-30 | JL COMERCIAL AGROQUIMICA LTDA<br>CIA NORTE, VIA CANDEIAS - KM 1,5<br>CANDEIAS - BA<br>43.800-000<br>CNPJ 12.190.013/0002-30 |
| EXPORTER | PRODUCER/MANUFACTURER |
| PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC.<br>ONE OVERLOOK POINT, SUITE 110<br>LINCOLNSHIRE, ILLINOIS 60069 U.S.A. | MOSAIC FERTILIZER, LLC<br>8813 HIGHWAY 41 SOUTH<br>RIVERVIEW, FLORIDA 33569 U.S.A. |
| PAYMENT TERMS | VESSEL |
| DRAFT AT 180 DAYS FROM B/L DATE<br>MATURITY DATE IS DECEMBER 10, 2007<br>ALL BANK CHARGES ARE FOR BUYER'S ACCOUNT | M/V PINTAIL |

| LOADPORT | DISCHARGE PORT | | DATE SHIPPED |
|---|---|---|---|
| TAMPA, FL, USA | ARATU, BA, BRAZIL | | June 13, 2007 |
| COUNTRY OF ORIGIN | COUNTRY OF PROVENIENCE | | SHIPPING TERMS |
| UNITED STATES OF AMERICA | UNITED STATES OF AMERICA | | CFR - COST AND FREIGHT |

WE DECLARE THAT ALL PRICES IN THIS INVOICE ARE THE CURRENT ONES IN THE INTERNATIONAL MARKET. WE HAVE NO PRICE LIST FOR THIS MATERIAL.

| QUANTITY MT | DESCRIPTION OF GOODS IN PORTUGUESE | UNIT PRICE | INVOICE VALUE |
|---|---|---|---|
| 1,045.000 | GMAP - GRANULAR MONOAMMONIUM PHOSPHATE - FOSFATO MONOAMONICO GRANULADO COM TEOR MINIMO DE 11% DE NITROGENIO E 52% DE P2O5 (PENTOXIDO DE FOSFORO), A GRANEL, PARA FABRICACAO DE FERTILIZANTES DESTINADOS A AGRICULTURA. NCM: 3105.40.00 | | |
| | PRICING FOB VALUE: | | |
| | 1,045.000    TM FOSFATO MONOAMONICO X FOB UNIT | | |
| | PRICE OF        USD 447.73   =        USD 467,877.85 | USD 447.73 | USD 467,877.85 |
| | FREIGHT VALUE: | | |
| | 1,045.000    TM FOSFATO MONOAMONICO X FOB UNIT | | |
| | PRICE OF        USD 46.00   =        USD 48,070.00 | USD 46.00 | USD 48,070.00 |
| | TOTAL CFR | USD 493.73 | USD 515,947.85 |
| | KINDLY WIRE TRANSFER FUNDS TO OUR ACCOUNT WITH<br>JP Morgan Chase ABA # 021000021 for Rabobank,<br>New York Account Number 400-212-307<br>for further credit to Phosphate Chemicals Export Association, Inc.<br>Account Number 20783 | | |
| | COUNTRY OF EXPORT - UNITED STATES OF AMERICA | | |
| | THESE COMMODITIES, TECHNOLOGY OR SOFTWARE WERE EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS. DIVERSION CONTRARY TO U.S. LAW PROHIBITED. | | |
| | THESE COMMODITIES LICENSED BY THE UNITED STATES FOR ULTIMATE DESTINATION BRAZIL. | | |
| | PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC.<br>CINDY GERAS, EXPORT COORDINATOR<br>SIGNED COMMERCIAL INVOICE | | |

TO THE PRICES SET FORTH IN THIS INSTRUMENT THERE WILL BE CHARGED A LATE PAYMENT CHARGE ON ANY PAST DUE BALANCES AT THE RATE OF ONE AND ONE HALF PERCENT (1-1/2%) PER MONTH (18.00% ANNUAL PERCENTAGE RATE) WHICH WILL APPLY AFTER THE MATURITY DATE.

# Exhibit F

PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC.
One Overlook Point, Suite 110
Lincolnshire, Illinois 60069
Tel: 763-577-2700 • Fax: 847-478-0994

**PhosChem**    COPY

| PHOSCHEM ORDER NUMBER: GMAP 076063 & 076063-1 | | DATE: SEPTEMBER 19, 2007 | NUMBER E1082 |
|---|---|---|---|

**DEBIT MEMO**

| SOLD TO: | FOR: |
|---|---|
| J.L COMERCIAL AGROQUIMICA LTDA. CIA NORTE, VIA CANDEIAS, KM 1,5 CANDEIAS - BA 43.800-000 CNPJ 12.190.013/0002-30 | DISCHARGE PORT DEMURRAGE |

| VESSEL: M/V PINTAIL | | VESSEL: |
|---|---|---|
| PRODUCT: GRANULAR MONOAMMONIUM PHOSPHATE | | PRODUCT: |
| M/TS SHIPPED: 2,090.000 | | M/TS SHIPPED: |
| DISCHARGE COUNTRY BRAZIL | | DISCHARGE COUNTRY |

| VESSEL: | VESSEL: |
|---|---|
| PRODUCT: | PRODUCT: |
| M/TS SHIPPED | M/TS SHIPPED |
| DISCHARGE COUNTRY | DISCHARGE COUNTRY |

| SHIPPED FROM: TAMPA, FL, USA | SHIPPING TERMS: CFR | DATE SHIPPED: JUNE 13, 2007 |
|---|---|---|

| DESCRIPTION | UNIT PRICE | TOTAL AMOUNT |
|---|---|---|
| TO DEBIT YOU FOR DEMURRAGE AT DISCHARGE PORT AS AGREED: | @$25,000.00 PER DAY | |
| TOTAL DUE PHOSCHEM | | USD9,888.07 |

PLEASE WIRE TRANSFER THE FUNDS TO OUR ACCOUNT WITH THE BANK OF NEW YORK, NEW YORK, NEW YORK, ACCOUNT NUMBER 865-6000-741, ABA 021000018 UNDER THE ACCOUNT NAME OF PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC

PHOSPHATE CHEMICALS EXPORT ASSOCIATION, INC.
G J MASNY